## UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff:  601 Riverside Avenue, Jacksonville, FL  32204

Address of Defendant:  1269 Waller Drive, Huntingdon Valley, PA 19006

Place of Accident, Incident or Transaction:  Montgomery County

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))                    Yes☒  No☐

Does this case involve multidistrict litigation possibilities?                    Yes☐  No☒

*RELATED CASE, IF ANY:*

Case Number: _____    Judge _____    Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
                    Yes☐  No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
                    Yes☐  No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
                    Yes☐  No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
                    Yes☐  No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

| A. *Federal Question Cases:* | B. *Diversity Jurisdiction Cases:* |
|---|---|
| 1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts | 1. ☒ Insurance Contract and Other Contracts |
| 2. ☐ FELA | 2. ☐ Airplane Personal Injury |
| 3. ☐ Jones Act-Personal Injury | 3. ☐ Assault, Defamation |
| 4. ☐ Antitrust | 4. ☐ Marine Personal Injury |
| 5. ☐ Patent | 5. ☐ Motor Vehicle Personal Injury |
| 6. ☐ Labor-Management Relations | 6. ☐ Other Personal Injury (Please specify) |
| 7. ☐ Civil Rights | 7. ☐ Products Liability |
| 8. ☐ Habeas Corpus | 8. ☐ Products Liability — Asbestos |
| 9. ☐ Securities Act(s) Cases | 9. ☐ All other Diversity Cases |
| 10. ☐ Social Security Review Cases | (Please specify) _____ |
| 11. ☐ All other Federal Question Cases | |
| (Please specify) _____ | |

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, Dana B. Ostrovsky _____, counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: March 5, 2018 _____    _____    83921 _____
                    Attorney-at-Law                    Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: March 5, 2018 _____    _____    83921 _____
                    Attorney-at-Law                    Attorney I.D.#

CIV. 609 (5/2012)

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Chicago Title Insurance Company | Yuriy Mazik, Tatyanna Mazik, Viktor Vasilenko, Irina Vasilenko and Galina Belenkaya |

**(b)** County of Residence of First Listed Plaintiff   Duval
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Montgomery
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Dana B. Ostrovsky, Fidelity National Law Group, 1515 Market St., Ste. 1410, Philadelphia, PA  19102 (267) 608-1725

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
         Plaintiff

☐ 2   U.S. Government
         Defendant

☐ 3   Federal Question
         *(U.S. Government Not a Party)*

☒ 4   Diversity
         *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                                    *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**   **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane         ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product          Product Liability |  |         28 USC 157 |          3729(a)) |
| ☐ 140 Negotiable Instrument |          Liability     ☐ 367 Health Care/ |  |  | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel &          Pharmaceutical |  | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
|          & Enforcement of Judgment |          Slander          Personal Injury |  | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'          Product Liability |  | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted |          Liability     ☐ 368 Asbestos Personal |  | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
|          Student Loans | ☐ 340 Marine          Injury Product |  |          New Drug Application | ☐ 470 Racketeer Influenced and |
|          (Excludes Veterans) | ☐ 345 Marine Product          Liability |  | ☐ 840 Trademark |          Corrupt Organizations |
| ☐ 153 Recovery of Overpayment |          Liability   **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
|          of Veteran's Benefits | ☐ 350 Motor Vehicle   ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle   ☐ 371 Truth in Lending |          Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| ☐ 190 Other Contract |          Product Liability ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) |          Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal          Property Damage |          Relations | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise |          Injury          ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
|  | ☐ 362 Personal Injury -          Product Liability | ☐ 751 Family and Medical |  | ☐ 893 Environmental Matters |
|  |          Medical Malpractice |          Leave Act |  | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS**   **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** |          Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights   **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting          ☐ 463 Alien Detainee |          Income Security Act |          or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment   ☐ 510 Motions to Vacate |  | ☐ 871 IRS—Third Party |          Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/          Sentence |  |          26 USC 7609 |          Agency Decision |
| ☐ 245 Tort Product Liability |          Accommodations ☐ 530 General |  |  | ☐ 950 Constitutionality of |
| ☒ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - ☐ 535 Death Penalty | **IMMIGRATION** |  |          State Statutes |
|  |          Employment    **Other:** | ☐ 462 Naturalization Application |  |  |
|  | ☐ 446 Amer. w/Disabilities - ☐ 540 Mandamus & Other | ☐ 465 Other Immigration |  |  |
|  |          Other            ☐ 550 Civil Rights |          Actions |  |  |
|  | ☐ 448 Education      ☐ 555 Prison Condition |  |  |  |
|  |          ☐ 560 Civil Detainee - |  |  |  |
|  |          Conditions of |  |  |  |
|  |          Confinement |  |  |  |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original
         Proceeding

☐ 2   Removed from
         State Court

☐ 3   Remanded from
         Appellate Court

☐ 4   Reinstated or
         Reopened

☐ 5   Transferred from
         Another District
         *(specify)*

☐ 6   Multidistrict
         Litigation -
         Transfer

☐ 8   Multidistrict
         Litigation -
         Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. §1332(a) (1)
Brief description of cause:
breach of note; equitable lien for fraudulent conveyances

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
     UNDER RULE 23, F.R.Cv.P.

DEMAND $
601,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE
03/05/2018

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Chicago Title Insurance Company | : | CIVIL ACTION |
| | : | |
| v. | : | |
| Yuriy Mazik, Tatyana Mazik, Viktor Vasilenko, Irina | : | |
| Vasilenko and Galina Belenkaya | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                    ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.                    ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.    ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.                    ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.)                    ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.    (X)

| | | |
|---|---|---|
| March 15, 2018 | Dana B. Ostrovsky | Plaintiff, Chicago Title Insurance Company |
| **Date** | **Attorney-at-law** | **Attorney for** |
| (267) 608-1728 | (215) 241-8794 | dana.ostrovsky@fnf.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CHICAGO TITLE INSURANCE COMPANY, 601 Riverside Avenue Jacksonville, FL 32204 <div align="center">Plaintiff,</div> v. <br> YURIY MAZIK, 1269 Waller Drive Huntingdon Valley, PA 19006 <br> TATYANA MAZIK, 1269 Waller Drive Huntingdon Valley, PA 19006 <br> VIKTOR VASILENKO, 1206 Laurel Avenue Warminster, PA 18974 <br> IRINA VASILENKO, 1206 Laurel Avenue Warminster, PA 18974 <br> GALINA BELENKAYA 1862 Greymont Street Philadelphia, PA 19116 <div align="center">Defendants.</div> | Civil Action No. |

## COMPLAINT

Plaintiff, Chicago Title Insurance Company, Inc. brings this action against Defendants and avers as follows:

### The Parties

1.      Plaintiff, Chicago Title Insurance Company ("CTIC"), is a Florida corporation with its principal place of business located at 601 Riverside Avenue, Jacksonville, FL 32204.

2.    Defendants, Yuriy and Tatyana Mazik, are adult individuals who own and reside at the real property commonly known as 1269 Waller Drive, Huntingdon Valley, PA 19006 ("the Waller Drive Property").

3.    Defendant, Tatyana Mazik, is also the present owner of the real property known as 1862 Greymont Street, Philadelphia, PA ("1862 Greymont Street"), and 9926 Haldeman Avenue Unit 22, Philadelphia, PA.

4.    Defendant, Galina Belenkaya, is an adult individual who owns and resides at 1862 Greymont Street. ("1862 Greymont").

5.    Defendants, Viktor and Irina Vasilenko, are adult individuals who own and reside at 1206 Laurel Avenue, Warminster, PA 18974.

## Jurisdiction and Venue

6.    This Court has jurisdiction based upon 28 U.S.C. §1332(a) (1) in that the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7.    Venue is proper in this District since the events giving rise to the claim occurred in this District.

## Factual Background

### *The Horseshoe Lane Property*

5.    In early 2005, Yuriy Mazik, purporting to act as a licensed real estate agent on behalf of Susan and Philip Shapiro ("the Shapiros"), negotiated purchase of the real property commonly known as 102 Horseshoe Lane, North Wales, PA. ("the Horseshoe Lane Property") from Eugenia Menis ("Menis").

6.    Upon information and belief, Yuriy Mazik also agreed to arrange for the Shapiros to obtain a mortgage loan to finance their purchase of the Horseshoe Lane Property.

7.    Upon information and belief, Yuriy Mazik was not a licensed real estate saleperson, nor was he a licensed mortgage broker.

8.    Upon information and belief, the Shapiros paid a $40,000 deposit under the agreement with Menis.

9.    Upon information and belief, on the scheduled date of the closing for the purchase of the Horseshoe Lane Property, Yuriy Mazik told the Shapiros for the first time that they had not qualified for a loan to finance the purchase and that they would be unable to close.

10.    Upon information and belief, the Shapiros had already sold their residence and needed to close on the Horseshoe Lane Property so that they had a home in which to live. They also risked losing their $40,000 deposit if the sale did not close.

11.    Yuri Mazik told the Shapiros that he could solve their problem as follows:

a. Menis would sell the Property to Yuriy Mazik's wife, Defendant, Tatyana Mazik, who would obtain a loan and mortgage to pay for the purchase while using the Shapiros' $40,000 deposit as part of the purchase price;

b. The Shapiros would live at the Property while they paid Tatyana Mazik's mortgage; and,

c. The Shapiros would eventually reapply for a loan and mortgage to enable them to purchase the Property from Tatyana Mazik.

12.    Upon information and belief, Yuriy Mazik arranged for Tatyana Mazik to purchase the Horseshoe Lane Property from Menis for $412,000 on March 5, 2005.

13.    In order to pay for her purchase of the Horseshoe Lane Property, Mazik obtained a purchase money loan from America's Wholesale Lender in the amount of $391,400 ("the Horseshoe Lane Loan") and signed a Promissory Note ("the Horseshoe Lane Note") memorializing the terms of same.  A true and correct copy of the Horseshoe Lane Note is attached hereto as Exhibit "A."

14.     As security for repayment of the Horseshoe Lane Loan, Mazik promised to give a valid lien of first priority against the Property for America's Wholesale Lender ("AWL"), and its successors and assigns, and she executed a mortgage memorializing the terms of same ("the Horseshoe Lane Mortgage"). A true and correct copy of the Horseshoe Lane Mortgage is attached hereto as Exhibit "B."

15.     In connection with the Horseshoe Lane Loan and Mortgage, Chicago issued a lender's policy of title insurance ("the Horseshoe Lane Policy") to America's Wholesale Lender, and its successors and assigns to insure the priority of the Horseshoe Lane Mortgage as a first lien on the Property. A true and correct copy of the Horseshoe Lane Policy Commitment is attached hereto as Exhibit "C."

16.     Due to fraud and collusion between Yuriy Mazik, Tatyana Mazik, and the settlement agent they selected to conduct the closing, which was not known to AWL or Chicago at the time, the Horseshoe Lane Mortgage was never recorded.

17.     After the May 2005 closing, a deed from Menis to Tatyana Mazik was recorded by the Montgomery County Recorder of Deeds in Book 5563, Page 436.

18.     Upon information and belief, the Shapiros moved into the Property in or around May 2005 and paid the monthly mortgage payments to Countrywide, the assignee of the Mortgage and Note from AWL.

19.     Upon information and belief, the Shapiros remained unable to obtain a loan to acquire the property from Tatyana Mazik, and they became concerned about the $40,000 they paid toward the purchase of the Horseshoe Lane Property—by Tatyana Mazik—and their ongoing payments towards the Horseshoe Lane Mortgage without a recorded ownership interest in the Horseshoe Lane Property.

20.    As an accommodation, Tatyana Mazik gave the Shapiros' daughter, Ashley J. Shapiro, a 50% interest in the Horseshoe Lane Property for the stated consideration of $1.00 by deed dated September 9, 2005.

21.    For some unknown reason, Ashley J. Shapiro quitclaimed her 50% interest in the Horseshoe Lane Property back to Tatyana Mazik for the stated consideration of $1.00 by deed dated June 30, 2007 and recorded in the Office of the Montgomery County Recorder of Deeds in Book 5654, Page 686.

22.    Less than seven months later, Tatyana Mazik conveyed the Horseshoe Lane Property to Ashley J. Shapiro's father, Philip Shapiro, by way of a deed dated February 14, 2008 for the stated consideration of $440,000, which was recorded in the Office of the Montgomery County Recorder of Deeds as Instrument No. 2008017962.

23.    That same day, Shapiro executed a mortgage against the Property and in favor of Emigrant Mortgage Company, Inc. to secure his repayment of a purchase money loan in the amount of $264,000.00 ("the Emigrant Mortgage"), which was recorded on February 26, 2008 in the Montgomery County Commissioner's Registry at Book 12331, Page 01994, as Instrument No. 2008017963.

24.    At the time of the sale to Shapiro, the Maziks failed to advise the settlement agent about the Horseshoe Lane Mortgage and failed to direct disbursement of any proceeds to satisfy her repayment obligation under the Horseshoe Lane Note.

25.    Thus, the Horseshoe Lane Loan was not paid off upon the sale to Shapiro; rather, the proceeds from the Emigrant Mortgage purchase money loan were distributed to the Maziks in cash.

26.    At or around that same time, Tatyana Mazik defaulted on her repayment of the Horseshoe Lane Note, which had been sold to Bank of New York.

27.    In connection with Bank of New York's foreclosure efforts, it discovered that the Maziks had already sold the Horseshoe Lane Property and taken the sale proceeds without satisfying the Horseshoe Lane Note.

28.    Bank of New York also discovered that the Mortgage had not been recorded, and therefore could not foreclose on the Horseshoe Lane Property.

29.    Accordingly, Bank of New York tendered a claim to Chicago under the Horseshoe Lane Policy.

30.    Chicago accepted coverage and tendered payment in the amount of $385,000.00 to Bank of America fbo Bank of New York (holder of the Note and Mortgage) pursuant to its obligations under the Horseshoe Lane Policy.  A true and correct copy of Chicago's payment letter to Bank of America is attached hereto as Exhibit "D."

31.    In exchange—and in accordance with the terms of the Horseshoe Lane Policy, Bank of America assigned its interest in the Horseshoe Lane Note and Mortgage to Chicago.

32.    Chicago is now the holder of the Horseshoe Lane Note and owner of the Horseshoe Lane Mortgage, but it has been unable to record a written assignment since the Horseshoe Lane Mortgage was not recorded when the Horseshoe Lane Property was sold.

33.    Chicago demanded that Defendant satisfy the entire principal amount due and owing to it by letters dated June 13, 2015 and September 16, 2015, but she has failed and refused to do so. True and correct copies of Chicago's demand letters are attached collectively hereto as Exhibit "E."

34.    The Horseshoe Loan Note remains in default for Defendant's failure to make the required monthly repayments, and there is a principal balance due and owing of $376,537.02, together with interest from February 2008, plus fees and costs for a total in excess of $480,000.

*The Rockwell Road Property*

35.     On or around August 5, 2005, Defendant and her husband, Yuriy Mazik, ("the Maziks") purchased the real property commonly known as 1477 Rockwell Road, Abington, PA 19001-2623 ("the Rockwell Road Property") for the stated consideration of $240,000.00.

36.     In order to pay for the Rockwell Road Property, the Maziks obtained a purchase money loan from AWL in the amount of $216,000 ("the Rockwell Road Loan") and signed a Promissory Note ("the Rockwell Road Note") memorializing the terms of same. A true and correct copy of the Rockwell Road Note is attached hereto as Exhibit "F."

37.     As security for repayment of the loan, the Maziks promised to give a valid lien of first priority against the Property for AWL, and its successors and assigns, and they executed a mortgage memorializing the terms of same ("the Rockwell Road Mortgage"). A true and correct copy of the Rockwell Road Mortgage is attached hereto as Exhibit "G."

38.     In connection with that transaction, Chicago issued a lender's policy of title insurance ("the Policy") to AWL, and its successors and assigns. A true and correct copy of the Policy Commitment is attached hereto as Exhibit "H."

39.     Due to fraud and collusion between the Maziks and others, including the settlement agent, which was not known to AWL or Chicago at the time, the Rockwell Road Mortgage was never recorded.

40.     On December 26, 2006, the Maziks conveyed the Rockwell Road Property to Viktor Lipovoy via Warranty Deed recorded on January 23, 2007 in the Montgomery County Recorder of Deeds at Book 5632, Page 01511 for the purported consideration of $430,000—although it does not appear that he gave a mortgage against the Rockwell Road Property in order to obtain title.

41.     Defendant failed to advise the settlement agent about the Rockwell Road Mortgage and failed to direct disbursement of any proceeds to satisfy her repayment obligation under the Rockwell Road Note.

42.     Thus, the Rockwell Road Loan was not paid off upon the conveyance to Lipovoy; rather, the proceeds—to the extent there were any—from the sale were distributed to Tatyana Mazik in cash.

43.     Even so, the Maziks continued to make the monthly payments due under the Rockwell Road Note.

44.     In the meantime, Viktor Lipovoy conveyed the Property to Scott M. Wargo and Greg A. Farrell via Warranty Deed dated March 24, 2007 and recorded on April 16, 2007 in the Montgomery County Recorder of Deeds at Book 5643, Page 00720 for the stated consideration of $423,750.00.

45.     In order to finance their purchase of the Rockwell Road Property, Scott M. Wargo and Greg A. Farrell obtained a purchase money loan from Cartus Home Loans ("Cartus") in the amount of $402,562.50 and granted Cartus a purchase money mortgage against the Property ("the Cartus Mortgage"), which was recorded on April 16, 2007 in the Montgomery County Recorder of Deeds at Book 12084, Page 00237.

46.     The Rockwell Road Note was not paid off with the proceeds of the Cartus Mortgage loan upon the sale to Wargo and Farrell.

47.     Rather, upon information and belief, all the proceeds from the Cartus Mortgage loan were distributed first to Lipovoy and then to the Maziks—either in whole or in part.

48.     Nevertheless, in order to conceal their wrongdoing, the Maziks continued to make the monthly payments due under the Rockwell Road Note until October 2009.

49.     By then, the Rockwell Road Mortgage loan had been sold to Bank of America.

50.    In preparation for filing an action to foreclosure the Rockwell Road Mortgage, Bank of America discovered that the Maziks had already sold the Rockwell Road Property and taken the sale proceeds without satisfying the Rockwell Road Mortgage loan.

51.    Bank of America also discovered that the Rockwell Road Mortgage had not been recorded, and therefore Bank of America could not foreclose on the Rockwell Road Property.

52.    Accordingly, Bank of America tendered a claim to Chicago under the Rockwell Road Policy.

53.    Chicago accepted coverage and tendered payment in the amount of $216,000.00 to Bank of America pursuant to its obligations under the Policy.

54.    In exchange, Bank of America assigned its right to collect payments under the Rockwell Road Note to Chicago as set forth in the written Assignment of Note dated July 27, 2017 and attached hereto as Exhibit "I."

55.    Upon tender of the Note to Chicago by Bank of America, Chicago became the owner of the Rockwell Road Mortgage, but it has been unable to record a written assignment since the Rockwell Road Mortgage was not recorded when the Rockwell Road Property was sold.

56.    The Rockwell Road Note remains in default for Defendant's failure to make the required monthly repayments, and there is a principal balance due and owing of $188,678.87, together with interest from February 2009, plus fees and costs for a total in excess of $322,000.

### The Waller Drive Property

57.    By deed recorded on or around October 27, 2000, Viktor Vasilenko acquired title to the Waller Drive Property for the stated consideration of $270,000.

58.    Upon information and belief, Viktor Vasilenko took a purchase money loan from Wachovia in the principal amount of $202,500 to acquire the Waller Drive Property, and he gave a

recorded mortgage against the Property to Fairfield Financial Mortgage Group, Inc. to secure his repayment.

59.     On or around October 8, 2002, Viktor Vasilenko refinanced the GMAC mortgage with the proceeds of a new loan for $250,000 from Wachovia, secured by a recorded mortgage against the Waller Drive Property.

60.     By deed recorded on April 15, 2003, Yuriy and Tatyana Mazik acquired title to the Waller Drive Property from Viktor and Irina Vasilenko for the stated consideration of $415,000.

61.     At the time, the Waller Drive Property had an assessed value of $247,000.

62.     The Maziks took a purchase money loan to acquire title to the Waller Drive Property and gave a mortgage to Chase Manhattan Mortgage Corp. for $322,700.00, which was recorded on March 27, 2003.

63.     In connection with the transfer to the Maziks, the Wachovia mortgage was satisfied of record on June 2, 2003.

64.     On or around August 9, 2004, the Maziks took a loan from Citibank FSB and gave it a second recorded mortgage against the Waller Drive Property for $50,000 to secure their repayment.

65.     On or around August 12, 2004, the Maziks took a loan from Wachovia and gave it a third recorded mortgage against the Waller Drive Property for $82,000 to secure their repayment.

66.     On or around November 12, 2008, Yuriy Mazik only gave a fourth recorded mortgage against the Waller Drive Property to Jake Sztejman for $27,500.

67.     By recorded deed dated November 13, 2009, Yuriy and Tatyana Mazik conveyed title to the Waller Drive Property back to Viktor Vasilenko for the stated consideration of $395,000.

68.    At the time of the transfer, the Maziks did not pay off the balance of the Chase mortgage loan, the 2004 Wachovia mortgage, or the Sztejman mortgage, and thus none of these mortgage was satisfied of record.

69.    The Mazik's 2004 Wachovia mortgage was satisfied of record in 2014.  The Chase mortgage and Sztejman mortgage remain of record to date.

70.    In her most recent filings to the U.S. Bankruptcy Court for the Eastern District of Pennsylvania, Chicago learned that despite the transfer of record title to Vasilenko in 2009, the Maziks have continued to live at the Waller Drive Property and hold themselves out as its owners.

71.    Upon information and belief, the Maziks' transfer of record title to Vasilenko was for the sole purpose of avoiding creditors such as Bank of America and Chicago.

72.    In this regard, Chicago recently discovered that Yuriy Mazik and Viktor Vasilenko had also shared ownership of another property at or around this time located at 1455 Edge Hill Road, Abington, PA. ("the Edge Hill Road Property") that was used to defraud present and future creditors.

### *1455 Edge Hill Road*

73.    Yuriy Mazik acquired title to the real property commonly known as 1455 Edge Hill Road, Abington, PA ("the Edge Hill Road Property") at some time prior to 2006.

74.    By deed recorded on May 22, 2007 he gave Viktor Vasilenko a 50% ownership interest in the Edge Hill Road Property for the stated consideration of $1.00.

75.    At the same time, Yuri Mazik and Viktor Vasilenko gave a mortgage recorded on May 24, 2007 against the Edge Hill Road Property to Vasilenko's wife, Irina Vasilenko, to secure their repayment of a loan in the state amount of $125,000.

76.    In May 2007, the assessed value of the Edge Hill Road Property was $14,930.00.

77.    By recorded deed dated October 31, 2008, Viktor Vasilenko quitclaimed his interest in the Edge Hill Road Property to Yuriy Mazik for the stated consideration of $1.00.

78.    The next day, Irina Vasilenko executed a satisfaction of mortgage that was recorded on November 12, 2008—the same day Yuri Mazik gave the $27,500 mortgage against Waller Drive to Jake Sztejman referenced above.

79.    Incidentally, Mazik also gave Jake Sztejman a mortgage in the amount of $27,500 against the Edge Hill Road Property that was recorded on January 7, 2009.

80.    Upon information and belief, this mortgage did not secure a debt owed by Mazik to Sztejman, but was recorded for the purpose of defrauding creditors.

81.    By recorded deed dated April 3, 2009, conveyed the Edge Hill Road Property to Sharone Lewis Davis for the stated consideration of $79,000.

82.    The $27,500 Sztejman mortgage and another $55,000 mortgage were marked satisfied against the Edge Hill Road Property.

83.    Thereafter, Sharone Lewis-Davis took a mortgage in the amount of $280,000, the proceeds of which were distributed—either in whole or in part—to Yuri Mazik and Viktor Vasilenko.

*1862 Greymont Street*

84.    By deed recorded on May 27, 1999, Tatyana Mazik and Galina Belenkaya took title to the real property commonly known as 1862 Greymont Street, Philadelphia, PA.

85.    By mortgage recorded on October 10, 2008, Yuriy Mazik—who never held record title to the Greymont Street Property—gave a mortgage in the amount of $25,000 to Viktor Vasilenko against the Greymont Street Property.

86.    On November 24, 2008, Viktor Vasilenko marked the mortgage from Mazik satisfied of record.

87.    Upon information and belief, this mortgage did not secure a debt owed by Mazik to Vasilenko, but was recorded for the purpose of defrauding creditors.

88.    In fact, it is believed and therefore averred that the Maziks and Vasilenkos made numerous transfers of real and personal property by and between themselves and others to defraud creditors such as Chicago.

## COUNT ONE
### Breach of Notes
### Chicago v. Tatyana Mazik

89.    Chicago repeats and re-alleges the allegations from the preceding paragraphs as though set forth more fully at length herein.

90.    Chicago is the holder of the Rockwell Road and Horseshoe Lane Notes (collectively referred to as "the Notes").

91.    Defendant Tatyana Mazik is obligated under the Notes to make timely payments in order to satisfy the balance.

92.    Defendant Tatyana Mazik has failed and refused to pay Chicago under the terms of the Notes.

93.    Defendant Tatyana Mazik's failure and refusal to pay Chicago under the terms of the Notes constitutes a material breach of the terms of same.

94.    As a result of Defendant Tatyana Mazik's breach, Plaintiff Chicago has been damaged.

95.    Chicago has made several demands that Defendant Tatyana Mazik satisfy her obligations under the Notes, but she has refused to comply.

96.    Pursuant to the terms of the Notes, Chicago is entitled to recover its reasonable attorneys' fees and costs incurred in pursuing this action.

**WHEREFORE,** Plaintiff Chicago requests that this Court enter judgment in its favor and against Tatyana Mazik in the principal amount of $802,000, plus interest, together with an award of attorney's fees and costs, and such other relief as the Court deems appropriate.

## COUNT TWO
## EQUITABLE MORTGAGE
### CTIC v. all Defendants

97.     Chicago repeats and re-alleges the allegations from the preceding paragraphs as though set forth more fully at length herein.

98.     Tatyana Mazik promised to give a mortgage against the Horseshoe Lane Property and the Rockwell Road Property to secure her repayment under the Notes, but she knowingly failed to do so.

99.     Instead, Tatyana Mazik--acting in concert with her husband, the Vasilenkos, and others--sold the Properties and took the sale proceeds without paying off the Notes, thus leaving her repayment thereunder unsecured.

100.    As a result, Chicago as assignee of the Notes, is entitled to an equitable mortgage against the Waller Drive Property; 1206 Laurel Avenue, Warminster, PA 18974; 1862 Greymont Street; and the Haldeman Street Property.

WHEREFORE, Fidelity requests that this Court enter in rem judgment in its favor and impose an equitable mortgage against the interests of Defendants, Yuriy Mazik, Tatyana Mazik, Viktor Vasilenko, Irina Vasilenko, and Galina Belenkaya, in the Waller Drive Property; 1206 Laurel Avenue, Warminster, PA 18974; 1862 Greymont Street; and the Haldeman Street Property in the total amount of $601,000, together with interest, costs of suit, and such other relief as the Court deems reasonable, just, and proper.

## COUNT THREE
## SUBROGATION
### CTIC v. the Maziks and Vasilenkos

101.    Chicago repeats and re-alleges the allegations from the preceding paragraphs as though set forth more fully at length herein.

102.    By virtue of the Defendants' wrongdoing and through no fault of its own, Chicago was compelled to pay $385,000 and $216,000—a total of $601,000—in accordance with its

obligations under the Horseshoe Lane Policy and Rockwell Road Policy (collectively referred to as "the Policies").

103.    By virtue of its payments under the Policies, Chicago is subrogated to the rights of its insured to seek repayment from Yuriy Mazik, Tatyana Mazik, Viktor Vasilenko, and Irina Vasilenko for the fees and costs it incurred to resolve the Horseshoe Lane and Rockwell Road Claims.

WHEREFORE, Fidelity requests that this Court enter judgment in its favor and against Defendants, Yuriy Mazik, Tatyana Mazik, Viktor Vasilenko, and Irina Vasilenko, in the amount of $601,000, together with interest, costs of suit, and such other relief as the Court deems reasonable, just, and proper.

<div align="center">

**COUNT THREE**
**INDEMNIFICATION**
**CTIC v. Defendants**

</div>

104.    Chicago repeats and re-alleges the allegations from the preceding paragraphs as though set forth more fully at length herein.

105.    By virtue of Yuriy Mazik, Tatyana Mazik, Viktor Vasilenko, and Irina Vasilenko's wrongdoing and through no fault of its own, Chicago was compelled to pay $385,000 and $216,000 in accordance with its obligations under the Policies.

106.    Under these circumstances, Pennsylvania law implies an obligation upon Yuriy Mazik, Tatyana Mazik, Viktor Vasilenko, and Irina Vasilenko to indemnify Chicago.

WHEREFORE, Fidelity requests that this Court enter judgment in its favor and against Yuriy Mazik, Tatyana Mazik, Viktor Vasilenko, and Irina Vasilenko in the amount of $601,000, together with interest, costs of suit, and such other relief as the Court deems reasonable, just, and proper.

Respectfully submitted,

FIDELITY NATIONAL LAW GROUP

Dated: 3/5/18

By: _____

Dana B. Ostrovsky
PA Attorney ID # 83921
1515 Market Street, Suite 1410
Philadelphia, PA 19102
T (267) 608-1728
Fax (215) 241-8794
Dana.Ostrovsky@fnf.com
Attorneys for Plaintiff

Exhibit "A"

#70099530

Prepared by: JM MCKINNEY

LOAN #: 103572835

# NOTE

MAY 05, 2005            SOUTHAMTON            PENNSYLVANIA
[Date]                   [City]                   [State]

102 HORSESHOE LN, NORTH WALES, PA 19454-4271
[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 391,400.00    (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
AMERICA'S WHOLESALE LENDER

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    6.000 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. PAYMENTS**

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the FIRST       day of each month beginning on
JULY 01, 2005       . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on JUNE 01, 2035       , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 660694, Dallas, TX 75266-0694
or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 2,346.64

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

(A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of FIFTEEN       calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

MULTISTATE FIXED RATE NOTE-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT       Init: ___

Page 1 of 3
VMP-6N (0001).01       CHL (10/01)(d)       VMP Mortgage Solutions, Inc. (800)521-7291       Form 3200 1/01




LOAN #: 101572035

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

PAY TO THE ORDER OF

WITHOUT RECOURSE
Countrywide Home Loans, Inc., a New York Corporation
Doing Business as America's Wholesale Lender

BY: _____
David A. Spector
Managing Director

010 101572035 N 001 001

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

Tatyana Marik                           (Seal)                                    (Seal)
TATYANA MARIK                         -Borrower                                  -Borrower

_____ (Seal)                                                          (Seal)
                 -Borrower                                                       -Borrower

(Sign Original Only)

-SN (0207).01    CHL (10/01)                    Page 2 of 2                        Form 3200 1/01

Exhibit "B"

Exhibit "C"

MAYMAY. 3. 2005811:09AM     NATIONWIDE FINANCIAL                    NO. 9470    P. 5^02/007



# Chicago Title Insurance Company

## COMMITMENT

File No: LC-2729CB                              Commitment No: LC-2729CB

### SCHEDULE A

Effective Date: February 14, 2005

1.   Policy (or policies) to be issued:

     OWNER'S:
     Proposed insured:                                    $   412,000.00

     Tatyana Mazik
     102 Horseshoe Lane, North Wales, PA 19454

     LOAN:
     Proposed insured:                                    $   391,400.00

     America's Wholesale Lender, its successors and/or assigns
     as their interests may appear

2.   The estate or interest in the land described or referred to in this Commitment and
     covered herein is fee simple, and title thereto is at the effective date hereof vested in:

     Eugenia Monis

3.   The land referred to in the Commitment is located in the County of Montgomery,
     Commonwealth of Pennsylvania and is described in Schedule C.

SCHEDULE A
ALTA Commitment

MAY. 3. 2005:11:09AM    NATIONWIDE FINANCIAL        NO. 9470    P. 6



## Chicago Title Insurance Company

### COMMITMENT

File No: LC-2729CB                    Commitment No: LC-2729CB

### SCHEDULE B – SECTION I

The following are the requirements to be complied with:

1.  Instrument(s) creating the estate or interest must be approved, executed and filed for record, to wit:

    A DEED FROM EUGENIA MENIS IN FAVOR OF TATYANA MAZIK TO BE RECORDED AT THE TIME OF THE CLOSING.

    A MORTGAGE IN THE AMOUNT OF 391,400.00 FROM TATYANA MAZIK IN FAVOR OF AMERICA'S WHOLESALE LENDER, TO BE RECORDED AT THE TIME OF THE CLOSING.

2.  Payment of the full consideration to, or for the account of, the grantors or mortgagors.

3.  Town, County and School Taxes and Water and Sewer Rents in the years 2003 through 2005, inclusive, to be produced and filed with the Company.

4.  Satisfactory evidence should be had that improvements and/or repairs or alterations thereto are completed; that contractors, subcontractors, labor and materialmen are paid.

5.  REAL ESTATE TAXES

    a.  Tax Receipts for the last three years to be produced and filed with the Company.

    b.  Current Assessment: $190,270.00

    c.  Parcel ID No.: 46-00-01684-00-5

    d.  Taxes for the current year: (Taxes Due 2004 $3,717.93).

| TYPE OF TAX | YEARLY AMOUNT | DUE DATE |
|---|---|---|
| Township | 287.31 | 5/1/05 |
| County | 540.37 | 5/1/05 |
| School | 3,379.20 | 9/1/05 |

6.  MORTGAGES:

    A.  $319,900.00 – Eugenia Menis to MERS, dated NEW, and recorded March 11, 2005, in Book 11408, Page 2953.

    B.  $59,900.00 – Eugenia Menis to MERS, dated NEW, and recorded March 11, 2005, in Book 11408, Page 2970.

7.  JUDGMENTS: None

8.  MECHANICS AND MUNICIPAL CLAIMS: None

9.  BANKRUPTCIES: None

SCHEDULE B – Section I
ALTA Commitment



**SCHEDULE B-I**
**(Continued)**

File No: LC-2729CB                    Commitment No; LC-2729CB

10.    OBJECTIONS: None

SCHEDULE B – Section I continued
ALTA Commitment

MAY MAY. 3 2005;11:09AM    NATIONWIDE FINANCIAL                    NO. 9470    P. 8/?/001



## Chicago Title Insurance Company

### COMMITMENT

File No: LC-2728CB                                    Commitment No: LC-2728CB

### SCHEDULE B – SECTION II

Schedule B of the Policy or Policies to be issued will contain certain exceptions to the matters noted hereafter unless the same are disposed of to the satisfaction of the Company.

1.  Defects, liens, encumbrances, adverse claims or other matters, if any created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date the proposed Insured acquires for value of record the estate or interest or mortgage thereon covered by this Commitment.

2.  Rights of claims of parties in possession not shown by the public records.

3.  Encroachments, overlaps, boundary line disputes, and any other matters which would be disclosed by an accurate survey and inspection of the premises.

4.  Easements, or claims of easements, not shown by the public records.

5.  Any lien, or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown by the public records.

6.  Taxes or special assessments which are not shown as existing liens by the public records.

7.  The Owner's Policy issued pursuant hereto will contain under Schedule B the mortgages, if any, noted under item 1 of Schedule B – Section 1.

SCHEDULE B – Section 2
ALTA Commitment

MAY. 3.2005 11:10AM    NATIONWIDE FINANCIAL    NO. 9470    P. 10/007



## Chicago Title Insurance Company

**SCHEDULE C**
**(Continued)**

File No: LC-2729CB                                    Commitment No: LC-2729CB

BEING the same premises which Joseph A. Carretta- Etal, by Deed dated New, and recorded March 11, 2005, in Book 5546, Page 1108, granted and conveyed unto Eugenia Menis, in fee.

SCHEDULE C continued
ALTA Commitment

Exhibit "D"



# Chicago Title Insurance Company

August 24, 2012

Kevin M. Kane
Phelan Hallinan & Schmieg, LLP
One Penn Center, Suite 1400
1617 JFK Blvd.
Philadelphia, PA 19103

RE:     Claim No.:           313843
        Policy No.:          FL5113-10-av6168-2008.2710609-75074893
        Named Insured:       America's Wholesale Lender
        Claimant:            The Bank of New York as Trustee for
                             Certificateholders CWALT, Inc. Alternative Loan
                             Trust 2006-J1 Mortgage Pass-Through Certificates,
                             Series 2006-J1
        Property:            102 Horseshoe Lane, North Wales, PA

Dear Mr. Kane:

Enclosed is our Company check number 10196646 in the amount of $385,000.00 payable to The Bank of New York as Trustee for Certificateholders CWALT, Inc. Alternative Loan Trust 2006-J1 Mortgage Pass-Through Certificates, Series 2006-J1 ("The Bank of New York"). Tender is made pursuant to paragraph 7 of the Conditions and Stipulations of the policy, which provides in pertinent part:

7.      DETERMINATION AND EXTENT OF LIABILITY.

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.

(a)     The liability of the Company under this policy shall not exceed the least of:

(i)     the Amount of Insurance stated in Schedule A, or, if applicable, the amount of insurance as defined in Section 2 (c) of these Conditions and Stipulations;

August 24, 2012
Kevin M. Kane
313843
Page 2

        (ii)     the amount of the unpaid principal Indebtedness secured by the Insured mortgage as limited or provided under Section 8 of these Conditions and Stipulations or as reduced under Section 9 of these Conditions and Stipulations, at the time the loss or damage insured against by this policy occurs, together with interest thereon; or

        (iii)    the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.

An appraisal of the insured property obtained by the Company valued the property at $385,000.00. Since the value of the property is less than the amount of insurance stated in Schedule A of the policy or the amount of the unpaid principal indebtedness secured by the mortgage, the value of the property represents the amount of the loss suffered under the policy. The Company hereby tenders to the Bank of New York that amount in fulfillment of its obligations under the above-referenced policy. By this tender of payment, all of the Company's obligations under the policy are terminated. Please contact me with any additional questions regarding this file.

Please contact me if you have any questions or concerns.

Thank you kindly,

*Robert E. Baker*

Robert E. Baker
Senior Claims Counsel

REB/gpp
Enclosure

Chicago Title Insurance Company

| VENDOR NO. | 47251 | NAME: | THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATE | CHECK DATE 8/23/2012 | 10196646 |

| INVOICE NO. | INV DATE | CONTROL NO. | DESCRIPTION | GROSS AMOUNT | DISCOUNT TAKEN | NET AMOUNT PAID |
|---|---|---|---|---|---|---|
| TR779919 | 8/23/2012 | 313843 | | 385,000.00 | .00 | 385,000.00 |
| | | | TOTAL > | 385,000.00 | 0.00 | 385,000.00 |

**Chicago Title Insurance Company**
601 Riverside Avenue
Bldg. 5, 6th Floor
Jacksonville, FL 32204 (904)357-1565

Harris Trust and Savings Bank
Roselle, IL
70-1558/719

10196646

8/23/2012

***385,000.00

PAY    Three Hundred Eighty-Five Thousand and 00/100******

TO THE
ORDER
OF

THE BANK OF NEW YORK AS TRUSTEE FOR THE CERTIFICATEHOLDERS
CWALT, INC. ALTERNATIVE LOAN TRUST 2006-J1 MORTGAGE
PASS-THROUGH CERTIFICATES, SERIES 2006-J1

*Dail K. Mughes*

CHECK IS PRINTED ON SECURITY PAPER WHICH INCLUDES A MICROPRINT BORDER & FLUORESCENT FIBERS

⑊10196646⑊ ⑈071915580⑈ 0⑈218⑈495⑈0⑈ ⑈0038500000⑈

Exhibit "E"

# CHICAGO TITLE INSURANCE COMPANY



2533 North 117th Avenue, Omaha, NE 68164-3679 • Tel: (402) 498-7000 • Fax: (402) 496-8802 • (888) 453-4095

September 16, 2015

<u>Via US Mail and Certified US Mail to:</u>
Tatyana Mazic
1269 Waller Drive
Huntington Valley, PA 19006

|  |  |
|---|---|
| Re: | Claim # 313843 |
| Property: | 102 Horseshoe Lane, North Wales, PA 19454 |
| Policy Number: | LC27299CB |

Dear Ms. Mazic,

This follows Chicago Title Insurance Company's (the "Company") letter to you dated June 12, 2015 wherein the Company demanded payment from you in the amount of $385,000. A copy of that letter is enclosed for your convenience and reference.

Our records reflect that more than 30 days have elapsed since the enclosed letter was sent and you have not responded to the Company's demand.

The Company is now the holder of the note (the "Note) you executed in favor of America's Wholesale Lender on May 5, 2005. By virtue of your failure to make payments as they have become due and payable, you are now in default under the terms of the Note. Your default has caused the Company to accelerate the maturity of the Note. So long as the Note remains unpaid, interest will continue to accrue.

Please be advised that the Company's position with respect to your liability for the amount demanded remains unchanged. While the Company would prefer to reach an amicable and informal resolution to this matter with you, it may have no choice but to refer this matter to litigation counsel should it become clear that an informal resolution cannot be reached. To avoid the potential escalation of this matter, the Company suggests that you send payment or otherwise contact the undersigned as soon as possible. The Company will put this matter on hold for another thirty (30) days to give you time to arrange for payment or otherwise respond. Should you fail to respond, the Company will assume that an informal resolution to this matter will not be possible and it will proceed accordingly.

Payment can be sent to:

Chicago Title Insurance Company
ATTN: Emily Heidbreder (Claim #313843)
PO Box 241718
Omaha, Nebraska 68124-5718.

If you dispute liability or cannot arrange for payment within this time frame, you or your legal representative should contact the undersigned within thirty days to explain your position.

We appreciate your prompt attention to this matter.

Very truly yours,

Emily Heidbreder
Associate Recoupment Counsel
Chicago Title Insurance Company
Direct: 402-498-7008
emily.heidbreder@fnf.com

# CHICAGO TITLE INSURANCE COMPANY



2533 North 117th Avenue, Omaha, NE 68164-3679 • Tel: (402) 498-7000 • Fax: (402) 496-8802 • (888) 453-4095

June 12, 2015

*VIA CERTIFIED & US MAIL*

Ms. Tatyana Mazik
1269 Waller Drive
Huntingdon Valley, PA 19006-6021

| | |
|---|---|
| File No.: | 313843 |
| Property: | 102 Horseshoe Lane, North Wales, PA 19454 |
| Policy: | LC27299CB |
| Re: | Assignment of Bank of America Note |
| Damages: | $385,000.00 |

Dear Ms. Mazik:

I am a senior recoupment attorney with Chicago Title Insurance Company ("Chicago" or "the Company"). The purpose of this correspondence is to notify you that Chicago has a valid claim for damages against you in the amount of $385,000.00.

Bank of America, successor in interest to the mortgage held by America's Wholesale Lender ("AWL"), is the named insured under a Lender's Policy for Title Insurance No. LC27299CB (the "Policy"). On or about May 5, 2005, you obtained a loan in the amount of $391,400.00 from AWL. To secure payment of the loan, you executed and delivered a mortgage (the "Insured Mortgage") and Promissory Note ("Insured Note") to AWL, which encumbered real property located at 102 Horseshoe Lane, North Wales, PA 19454 (the "Property"). Lexington & Concord Search & Abstract issued the Policy on behalf of the Company. However, the Insured Mortgage was never recorded in the public records.

On February 26, 2008, you conveyed the Property to Philip Shapiro ("Shapiro") via deed recorded in Book 5683, Page 1428 of the Montgomery County Register of Deeds. In order to finance the purchase of the Property, Shapiro executed a mortgage ("EMC Mortgage") in favor of Emigrant Mortgage Company ("EMC") to secure a loan in the amount of $264,000.00. Shapiro subsequently defaulted on the loan repayment terms of the Insured Mortgage. Consequently, EMC commenced foreclosure preparations and discovered the existence of the Insured Mortgage. Bank of America, assignee of the Insured Mortgage, filed a claim with the Company under the Policy after discovering that the EMC Mortgage asserted priority over the Insured Mortgage.

Pursuant to the terms of the Policy, the Company was obligated to protect the rights of the Insured. Accordingly, the Company reached a settlement with Bank of America whereby the Company paid $385,000.00 in exchange for transfer of the Note.

As the Note Holder, Chicago hereby makes demand upon you in the amount of $385,000.00. Please remit this amount immediately to the Company at the following address:

Chicago Title Insurance Company
Attn: Ryan J. Muldoon (Claim 313843)
P.O. Box 241718
Omaha, NE 68124-5718

Please do not ignore this correspondence. Should you fail to reimburse the Company within twenty (20) days, appropriate legal action may be taken against to collect damages, associated court costs and fees. If you have retained an attorney please instruct them to contact me by phone at (402) 498-7535 or e-mail at ryan.muldoon@fnf.com. Please reference the above claim number on all communications sent to the Company.

Your prompt attention to this matter is appreciated. Nothing contained herein is intended as, nor should it be deemed to constitute, a waiver or relinquishment of any of the Company's rights or remedies, whether legal or equitable, all of which are hereby expressly reserved.

Thank you for your anticipated cooperation in this matter.

Respectfully,

Ryan J. Muldoon
AVP/Senior Recoupment Counsel
Fidelity National Title Group
(402) 498-7535
ryan.muldoon@fnf.com

Enc.    Copy of Note executed by Tatyana Mazik on May 5, 2005

Exhibit "F"

Prepared by: CHERYL A. EDWARDS

LOAN #: 110473792

# NOTE

AUGUST 05, 2005
(Date)

SOUTHAMPTON
(City)

PENNSYLVANIA
(State)

1477 ROCKWELL RD, ABINGTON, PA 19001-2623
(Property Address)

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 216,000.00     (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is MARION'S WHOLESALE LENDER

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    6.375 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3. PAYMENTS**

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the   FIRST   day of each month beginning on OCTOBER 01, 2005    . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on   SEPTEMBER 01, 2035   , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 660694, Dallas, TX 75266-0694 or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $1,347.56

**4. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

**5. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

(A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of   FIFTEEN   calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of this charge will be    5.000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

MULTISTATE FIXED RATE NOTE–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Page 1 of 3



-3H (0107)01    -01L (010/04)(d)     Form 3200 1/01
VMP Mortgage Solutions, Inc. (800)521-7291



LOAN #: 110473792

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial Interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)      _____ (Seal)
TRAVON SKLYAR                    -Borrower                                        -Borrower

_____ (Seal)      _____ (Seal)
                                 -Borrower                                        -Borrower

(Sign Original Only)

-SN(0207).01   OHL (10/04)            Page 2 of 2            Form 3200 1/01

## CERTIFICATE OF ASSISTANT SECRETARY
### OF
### BANK OF AMERICA, NATIONAL ASSOCIATION

The undersigned, Devra Lindgren, an Assistant Secretary of Bank of America, National Association (the "Association"), a national banking association organized and existing under the laws of the United States of America and having its principal place of business in the City of Charlotte, County of Mecklenburg, State of North Carolina, does hereby certify that:

1.    The following persons have been duly elected or appointed and have duly qualified as officers of the Association and they hold the office set forth opposite their names:

| Name | Title |
|------|-------|
| Deborah Barberenn | Assistant Vice President |
| Ryan Bhagan | Assistant Vice President |
| Kelly Bratz | Assistant Vice President |
| Jorge L. Garcia | Assistant Vice President |
| Angie Henry | Assistant Vice President |
| Ryan Loria | Assistant Vice President |
| Richard Mahotiere | Assistant Vice President |
| Gregory Neal | Assistant Vice President |
| Samuel Rowe | Assistant Vice President |
| Elizabeth Stack | Assistant Vice President |

2.    The following is a true and complete copy of an excerpt from the Bylaws of the Association, and the same is in full force and effect as of the date hereof:

Section 5.2. Execution of Instruments. All agreements, indentures, mortgages, deeds, conveyances, transfers, contracts, checks, notes, drafts, loan documents, letters of credit, guarantees, master agreements, swap agreements, security and pledge agreements, guarantees of signatures, certificates, declarations, receipts, discharges, releases, satisfactions, settlements, petitions, schedules, accounts, affidavits, bonds, undertakings, powers of attorney, and other instruments or documents may be signed, executed, acknowledged, verified, attested, delivered or accepted on behalf of the Association by the Chairman of the Board, the President, any Vice Chairman of the Board, any Division President, any Managing Director, any Principal, any Vice President, any Assistant Vice President, or any individual who is listed on the Association's personnel records in a position equal to any of the aforementioned officer positions, or such other officers, employees or agents as the Board of Directors or any of such designated officers or individuals may direct. The provisions of this Section 5.2 are supplementary to any other provision of these Bylaws and shall not be construed to authorize execution of instruments otherwise dictated by law.

IN WITNESS WHEREOF, I have hereunto signed my name and affixed the seal of the Association on this 13th day of September, 2012.

BANK OF AMERICA, NATIONAL ASSOCIATION

By: *Devra Lindgren*

Devra Lindgren, Assistant Secretary

Exhibit "G"

Prepared By:

CHERYL A. EDWARDS
AMERICA'S WHOLESALE LENDER

1210 NORTHBROOK DR. #300
TREVOSE
PA 19053

Phone: (215)322-3700

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.

MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423
Parcel Number:

Premises:
1477 ROCKWELL RD
ABINGTON
PA 19001-2623

---

——— [Space Above This Line For Recording Data] ———

00011047379200005
[Doc ID #]

# MORTGAGE

MIN 1000157-0001306822-2

PENNSYLVANIA - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
Page 1 of 17
-6A(PA) (0502)    CHL (02/06)(d)    VMP Mortgage Solutions, Inc. (800)521-7291    Initials: _____
Form 3039 1/01






. DOC ID #: 00011047379208005

DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in Sections 3,
11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in
Section 16.
(A) "Security Instrument" means this document, which is dated AUGUST 05, 2005
together with all Riders to this document.
(B) "Borrower" is
TERESA SKLYAR, AND YURIY MAZIK

Borrower is the mortgagor under this Security Instrument.
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting
solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this
Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and
telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(D) "Lender" is
AMERICA'S WHOLESALE LENDER

Lender is a
CORPORATION

organized and existing under the laws of NEW YORK
Lender's address is
P.O. Box 660694, Dallas, TX 75266-0694

(E) "Note" means the promissory note signed by Borrower and dated AUGUST 05, 2005
The Note states that Borrower owes Lender
TWO HUNDRED SIXTEEN THOUSAND and 00/100

Dollars (U.S. $ 216,000.00          ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than SEPTEMBER 01, 2035
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

VMP -6A(PA) (0502)      CHL (02/05)          Page 2 of 17                    Initials: _TS_
                                                                            Form 3039 1/01

DOC ID #: 00011047379208005

(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

- [ ] Adjustable Rate Rider
- [ ] Balloon Rider
- [ ] VA Rider
- [ ] Condominium Rider
- [ ] Planned Unit Development Rider
- [ ] Biweekly Payment Rider
- [ ] Second Home Rider
- [ ] 1-4 Family Rider
- [X] Other(s) [specify] LEGAL

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "Escrow Items" means those items that are described in Section 3.

(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to

VMP -6A(PA) (0502)    CHL (02/05)    Page 3 of 17    Initials: ___    Form 3039 1/01

DOC ID #: 00011047379208005

MBRS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MBRS, the following described property located in the

COUNTY                    of                    MONTGOMERY

[Type of Recording Jurisdiction]                         [Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

which currently has the address of

1477 ROCKWELL RD, ABINGTON
[Street/City]

Pennsylvania 19001-2623 ("Property Address"):
[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MBRS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MBRS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

VMP -6A(PA) (0302)          CHL (02/05)          Page 4 of 17          Form 3039 1/01



DOC ID #: 00011047379208005

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums

-6A(PA) (0502)        CHL (02/06)        Page 5 of 17        Initials: _____        Form 3039  1/01



DOC ID #: 00011047379208005

for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on

VMP®-6A(PA) (0502)    CHL (02/05)    Page 6 of 17    Initials: T.S.    Form 3039 1/01



DOC ID #: 00011047379208005

the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.



DOC ID #: 00011047379208005

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

VMP -6A(PA) (0502)      CHL (02/05)                    Page 6 of 17                      Initials: _L.S._              Form 3039  1/01



DOC ID #: 00011047379208005

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan



DOC ID #: 00011047379208005

is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or

DOC ID #: 00011047379208005

repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of

UMP -0A(PA) (0502)    CHL (02/08)    Page 11 of 17    Form 3039 1/01

DOC ID #: 00011047379208005

Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by

DOC ID #: 00011047379208005

this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency,

VMP  -6A(PA) (0502)        CHL (02/06)        Page 13 of 17        Initials: ___        Form 3039 1/01



DOC ID #: 00011047379208005

Instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

UMP -6A(PA) (0502)          CHL (07/05)          Page 14 of 17          Initials: _____

Form 3038 1/01



DOC ID #: 00011047379208005

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). Lender shall notify Borrower of, among other things: (a) the default; (b) the action required to cure the default; (c) when the default must be cured; and (d) that failure to cure the default as specified may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. Lender shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured as specified, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, attorneys' fees and costs of title evidence to the extent permitted by Applicable Law.

23. Release. Upon payment of all sums secured by this Security Instrument, this Security Instrument and the estate conveyed shall terminate and become void. After such occurrence, Lender shall discharge and satisfy this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waivers. Borrower, to the extent permitted by Applicable Law, waives and releases any error or defects in proceedings to enforce this Security Instrument, and hereby waives the benefit of any present or future laws providing for stay of execution, extension of time, exemption from attachment, levy and sale, and homestead exemption.

25. Reinstatement Period. Borrower's time to reinstate provided in Section 19 shall extend to one hour prior to the commencement of bidding at a sheriff's sale or other sale pursuant to this Security Instrument.

26. Purchase Money Mortgage. If any of the debt secured by this Security Instrument is lent to Borrower to acquire title to the Property, this Security Instrument shall be a purchase money mortgage.

27. Interest Rate After Judgment. Borrower agrees that the interest rate payable after a judgment is entered on the Note or in an action of mortgage foreclosure shall be the rate payable from time to time under the Note.

GA(PA) (0502)    OHL (02/08)                Page 16 of 17                    Initials: ____    Form 3039 1/01

DOC ID #: 00011047379208005

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____

_____

_____    _____(Seal)
TERESA SKLYAR                                        -Borrower

_____    _____(Seal)
YURIY MAZIK                                          -Borrower

_____    _____(Seal)
                                                     -Borrower

_____    _____(Seal)
                                                     -Borrower

-6A(PA) (0302)    CHL (02/05)         Page 16 of 17              Form 3039  1/01

COMMONWEALTH OF PENNSYLVANIA,                DOC ID #: 00011047379208005
                                             *Bucks*                County ss:

On this, the _5th_ day of _August, 2005_ before me, the
undersigned officer, personally appeared _Yurly Mrnzik and Teresa Skylar_

_____ known to me (or satisfactorily proven) to be the
person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that he/she/they
executed the same for the purposes herein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.
My Commission Expires:

_Settlement Agent_
Title of Officer

NOTARIAL SEAL
Angel A. Rizk-Allan, Notary Public
Upper Southampton, Twp., Bucks County
My commission expires June 14, 2009

Certificate of Residence
I, _Angel A. Rizk-Allan_, do hereby certify that
the correct address of the within-named Mortgagee is P.O. Box 2026, Flint, MI 48501-2026.

Witness my hand this _8th_ day of _August, 2005_

Agent of Mortgagee

VMP -6A(PA) (0502)      CHL (02/05)      Page 17 of 17      Initials: _TS_
                                                            Form 3039  1/01

Prepared by: CHERYL A. EDWARDS

AMERICA'S WHOLESALE LENDER

DATE:          09/05/2005
CASE #:
DOC ID #:   00011047379208005
BORROWER: TERESA SKLYAR
PROPERTY ADDRESS: 1477 ROCKWELL RD
                ABINGTON, PA 19001-2623

Branch #: 0000945
1210 NORTHBROOK DR. #300
TREVOSE, PA 19053
Phone: (215) 322-3700
Br Fax No.: (N)

LEGAL DESCRIPTION EXHIBIT A

FHA/VA/CONV
• Legal Description Exhibit A
1C404-XX (04/03)(d)



Exhibit "H"



# Chicago Title Insurance Company

### COMMITMENT

File No: LC-2668JG

Commitment No: LC-2558JG

### SCHEDULE B -- SECTION I

The following are the requirements to be complied with:

1. Instrument(s) creating the estate or interest must be approved, executed and filed for record, to wit:

   A DEED FROM HARRY B. HAEBERLE IN FAVOR OF YURIY MAZIK AND TERESA SKLYAR TO BE RECORDED AT THE TIME OF THE CLOSING.

   A MORTGAGE IN THE AMOUNT OF 210,000.00 FROM YURIY MAZIK AND TERESA SKLYAR IN FAVOR OF AMERICA'S WHOLESALE LENDER, TO BE RECORDED AT THE TIME OF THE CLOSING.

2. Payment of the full consideration to, or for the account of, the grantors or mortgagors.

3. Town, County and School Taxes and Water and Sewer Rents in the years 2003 through 2005, inclusive to be produced and filed with the Company.

4. Satisfactory evidence should be had that improvements and/or repairs or alterations thereto are completed; that contractors, subcontractors, labor and materialmen are paid.

5. REAL ESTATE TAXES

   a. Tax Receipts for the last three years to be produced and filed with the Company.
   b. Current Assessment $191,030.00
   c. Parcel ID No.: 30-00-57665-00-2
   d. Taxes for the current year: $

| TYPE OF TAX | YEARLY AMOUNT | DUE DATE |
|---|---|---|
| Township | See attached | 5/1/06 |
| County | See attached | 5/1/06 |
| School | See attached | 9/1/05 |

6. MORTGAGES

   A. $100,000.00 - Harry B. Hochone to Wachovia Bank N.A., dated November 6, 2002, and recorded December 4, 2002, In Book 0903, Page 277.

7. JUDGMENTS: None

8. MECHANICS AND MUNICIPAL CLAIMS:    None

9. BANKRUPTCIES:    None

10. OBJECTIONS: None

SCHEDULE B -- Section 2
ALTA Commitment

*Data Trace*

Title #: NG-255930

500 Executive Drive, Suite 275 · West Orange, New Jersey 07052
Phone (800) 477-8288 · Fax (800) 677-3732

FOR: LEXINGTON AND CONCORD SEARCH

PARCEL #: 30-00-57868-002
LOT      : 0064

                                ASSESSED OWNER: HAEBERLE, HARRY BRITT
                                       1477 ROCKWELL R, ABINGTO, PA 19001
                    LEGAL ADDRESS : 1477 ROCKWELL RD
                                    ABINGTON TWP (215) 884-5000
LOT SIZE: 13335 SQ FT                1176 OLD YORK RD, ABINGTON, PA
                    TAX COLLECTOR : MAX M. SOLOMON (215) 884-5000
                                    1176 OLD YORK RD, ABINGTON, PA
MONTGOMERY COUNTY COLLECTOR:        MAX M. SOLOMON (215) 884-5000
                                    1176 OLD YORK RD, ABINGTON, PA
ABINGTON CITY SCHOOL COLLECTOR:     MAX SOLOMON (215) 884-5000
                                    1176 OLD YORK RD, ABINGTON, PA19001
MILLAGE RATES     :  MUNICIPAL: 3.54       COUNTY: 2.89          SCHOOL: 22.18
ASSESSED VALUES   :  LAND: SEE TOTAL       INPROVE: SEE TOTAL    TOTAL: $191,630
LAND USE CODE     :  1101                  DESC: SINGLE FAMILY
DEDUCTIONS        :  NONE
INFORMATION       :

LIENS: NONE

           2004: PIF      2003: PIF      2002: PIF
    < PAYMENTS OF PRIOR YEARS TAXES ARE MADE TO THE COUNTY TAX CLAIM BUREAU >

CURRENT TAXES:      DISCOUNT              FACE                  PENALTY
                  BEFORE: 4/04/05     4/04/05-6/03/05        AFTER: 6/03/05
MUNICIPAL (2005): $1,020.00 OPEN *    NOT APPLICABLE         NOT APPLICABLE

COUNTY (2005):    BEFORE: 4/04/05     4/04/05-6/03/05        AFTER: 6/03/05
                  $543.00 OPEN:       NOT APPLICABLE         NOT APPLICABLE

SCHOOL (7/01/2004-6/30/2005):         9/01/04-10/31/04       AFTER: 11/01/04
                  $4,266.00 PAID      NOT APPLICABLE         NOT APPLICABLE

INTERIM ASSESSMENTS: NONE BILLED AS OF 3/11/2005

NOTES:
  * INCLUDES OTHER & REFUSE CHARGES OF $365.00

Data Trace Guarantees that the above information accurately reflects the contents
of the public record as of 3/12/2005

 

 **Chicago Title Insurance Company**

SCHEDULE B-II
(Continued)

File No: LC-2559JG

Commitment No: LC-2559JG

## SCHEDULE B -- SECTION II

Schedule B of the Policy or Policies to be issued will contain certain exceptions to the matters noted hereafter unless the same are disposed of to the satisfaction of the Company.

1. Defects, liens, encumbrances, adverse claims or other matters, if any created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date the proposed insured acquires for value of record the estate or interest or mortgage thereon covered by this Commitment.

2. Rights of claims of parties in possession not shown by the public records.

3. Encroachments, overlaps, boundary line disputes, and any other matters which would be disclosed by an accurate survey and inspection of the premises.

4. Easements, or claims of easements, not shown by the public records.

5. Any lien, or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown by the public records.

6. Taxes or special assessments which are not shown as existing liens by the public records.

7. The Owner's Policy issued pursuant hereto will contain under Schedule B the mortgages, if any, noted under item 1 of Schedule B -- Section 1.

SCHEDULE B -- Section 2 continued
ALTA Commitment



**Chicago Title Insurance Company**

COMMITMENT

File No: LC-2559JG

Commitment No: LC-2559JG

SCHEDULE C
LEGAL DESCRIPTION

The land referred to in this Commitment is described as follows:

ALL THAT    CERTAIN LOT OR PIECE OF GROUND WITH THE BUILDINGS AND
IMPROVEMENTS THEREON ERECTED, SITUATE IN THE TOWNSHIP OF ABINGTON,
COUNTY OF MONTGOMERY AND STATE OF PENNSYLVANIA, BEING KNOWN AS
NUMBERED LOT NO. 64 ON PLAN OF "HIGHLAND FARM", MADE BY ALBRIGHT AND
MANUS, CIVIL ENGINEERS, IN FEBRUARY A.D. 1922, WHICH PLAN IS DULY RECORDED
AT NORRISTOWN IN DEED BOOK NO. 842, PAGE 600 &C.

BEGINNING AT A POINT ON THE EASTERLY SIDE OF ROCKWELL ROAD (40 FEET
WIDE),SAID POINT BEING AT A DISTANCE OF 80.67 FEET MEASURED SOUTH 16
DEGREES 14 MINUTES WEST FROM THE POINT OF INTERSECTION WHICH THE
AFORESAID    SIDE   OF   ROCKWELL   ROAD   PRODUCED   MAKES   WITH   THE
SOUTHEASTERLY SIDE OF EDGE HILL ROAD (40 FEET WIDE) PRODUCED; THENCE
ALONG LOT NO. 63 SOUTH 74 DEGREES 46 MINUTES, EAST 146.86 FEET TO A POINT IN
THE REAR OF LOT NO.66; THENCE PARTLY ALONG REAR OF LOT NO.66 AND ALONG
THE REAR OF LOTS NOS. 67 AND 68 SOUTH 43 DEGREES 32 MINUTES WEST 137.11
FEET TO A POINT IN THE REAR OF LOT NO.65; THENCE ALONG THE REAR OF LOT NO.
65 SOUTH 80 DEGREES 22 MINUTES 36 SECONDS WEST 55. 26 FEET TO A POINT IN
THE EAST SIDE OF ROCKWELL ROAD; THENCE BY AND ALONG THE SAME BY A LINE
CURVING TO THE RIGHT HAVING A RADIUS OF 342.46 FEET, THE ARC DISTANCE OF
146.57 FEET TO THE PLACE OF BEGINNING.

BEING the same premises which First Pennsylvania Bank N.A., et.al., by Deed dated
August 20, 1988, and recorded November 14, 1988, in Book 4893, Page 1058, granted and
conveyed unto Harry B. Huebalte, in fee.

SCHEDULE C
ALTA Commitment

 

## LEXINGTON & CONCORD SEARCH AND ABSTRACT, LLC
960 Industrial Blvd., 2nd Floor
Southampton, PA 18966-4005
Telephone: 215-942-7892 Fax: 215-942-7891

Date:  June 15, 2005

RE:   Yurly Mazik and Tereza Sklyar
      1477 Rockwell Road, Abington, PA 19001

File #:  LC-2559JG

Dear Sir/Madam:

America's Wholesale Lender will be insured in FIRST LIEN POSITION up to the day of settlement.

Very truly yours,

Glenn Randall, Esquire



## LEXINGTON & CONCORD SEARCH & ABSTRACT, LLC
950 Industrial Boulevard
Southampton, PA 18966
Telephone: 215-942-7692 Fax: 215-942-7691

July 27, 2005

Loan Number:
Our File Number:        LC-2559JG
Borrowers' Names:       Yuriy Mazik and Teresa Sklyar
Property Address:       1477 Rockwell Road  Abington township , Montgomery County,
                        Pennsylvania

SUBJECT: WIRING INSTRUCTIONS

Willow Grove Bank
11730 Bustleton Avenue
Philadelphia, PA  19116

ABA # 23-137557-5

Account # 14-55304558

Lexington & Concord Search & Abstract, LLC

Ref: LC-2559     Yuriy Mazik

Please refer to our file number and memo on all wire transfers.

If you have any questions, please don't hesitate to call.

Sincerely,

Lexington & Concord Search & Abstract, LLC

 

## Chicago Title Insurance Company
*1601 Market Street, Philadelphia, PA 19103 ᵃᵗᵗ (215) 568-4800*

July 27, 2005

America's Wholesale Lender
PO Box 10266
MSN-SZ 79/Doc Control Dept
Van Nuys, CA 91410

Fax: _____

RE: Closing Service Letter
* Issuing Agent or Approved Attorney
Lexington & Concord Search & Abstract, LLC
960 Industrial Blvd., 2ⁿᵈ Floor, Southampton, PA 18966
* Binder or Commitment No: LC-23897JG
RE: Yuriy Mazik and Teresa Sklyar
1477 Rockwell Road, Abington, PA 19001

Dear Customer:

When title insurance of Chicago Title Insurance Company (the Company) is specified for your protection in connection with the closing of the above described real estate transaction (the Closing) in which you are to be a lender secured by a mortgage of an interest in land, the Company, subject to the Conditions and Exclusions set forth below, hereby agrees to reimburse you for actual loss incurred by you in connection with the Closing when conducted by the above named Issuing Agent (an agent authorized to issue title insurance for the Company) or the above named Approved Attorney (an attorney upon whose certification of title the Company issues title insurance) and when such loss arises out of:

1. Failure of the Issuing Agent or Approved Attorney to comply with your written closing instructions to the extent that they relate to (a) the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land, including the obtaining of documents and the disbursement of funds necessary to establish such title or lien or (b) the collection and payment of funds due you; or

2. Fraud or misapplication of the Issuing Agent or Approved Attorney in handling your funds in connection with matters set forth in numbered paragraph 1 above.

### CONDITIONS AND EXCLUSIONS

A. The Company will not be liable to you for loss arising out of:

1. Failure of the Approved Attorney to comply with your closing instructions which require title insurance protection inconsistent with that set forth in the title insurance binder or commitment issued by the Company. Instructions which require the removal of specific exceptions to title or compliance with the requirements contained in said binder or commitment shall not be deemed to be inconsistent.

2. Loss or impairment of your funds in the course of collection or while on deposit with a bank due to bank failure, insolvency or suspension, except such as shall result from failure of the Issuing Agent or the Approved Attorney to comply with your written closing instructions to deposit the funds in a bank which you designated by name.

3. Mechanics' and materialmen's liens in connection with a construction loan transaction, except to the extent that protection against such liens is afforded by a title insurance binder, commitment or policy of the Company.

* Must be completed for this Letter to be effective.




NO. 1639    P. 9

B.  If the closing is to be conducted by an Approved Attorney, a title insurance binder or commitment for the issuance of a policy of title insurance by the Company must have been received by you prior to the transmission of your final closing instructions to the Approved Attorney.

C.  Should the Company reimburse you pursuant to this letter, it shall be subrogated to all rights and remedies which you would have against any person or property had you not been so reimbursed. Liability of the Company for such reimbursement shall be reduced to the extent that you have knowingly and voluntarily impaired the value of such right of subrogation.

D.  Any liability of the Company for loss incurred by you in connection with the Closing by an Issuing Agent or Approved Attorney shall be limited solely to the protection provided by this letter.

E.  Liability under this letter is limited to the amount of the policy of title insurance to be issued, and any payment of loss under this letter shall constitute a payment under the policy.

F.  Claims shall be made promptly to the Company at its office at 171 N. Clark Street, Chicago, Illinois 60601-3294. When the failure to give prompt notice shall prejudice the Company, then liability of the Company hereunder shall be reduced to the extent of such prejudice.

G.  The Company shall not be liable hereunder unless notice of claim in writing is received by the Company within one year from the date of the Closing.

H.  This letter does not appoint the above named Approved Attorney, if any, as an agent of the Company.

I.  The scope and effect of this Letter is limited to a single transaction, which is the Closing on the commitment or binder referenced in the caption.

Chicago Title Insurance Company

By: _____

Charles F. Devine, Jr.

TIRBOF -- PA CSL (10/11/00)
TRANSACTION SPECIFIC

Exhibit "I"

## ASSIGNMENT OF MORTGAGE

**KNOW ALL MEN BY THESE PRESENTS** that Bank of America, N.A. ("Assignor"), in consideration of the sum of $216,000.00, and other valuable consideration, the receipt of which is hereby acknowledged, hereby transfers, assigns, grants and sets over to Chicago Title Insurance Company whose address is 601 Riverside Avenue, Building 5, Fourth Floor, Jacksonville, FL 32204 ("Assignee"), all of Assignor's right, title, interest, powers and options, in and to that certain Mortgage from Teresa Sklyar and Yuriy Mazik to America's Wholesale Lender dated August 5, 2005 as well as to the real and personal property described therein, together with the note and any other indebtedness secured thereby, and all monies due or to become due thereon with interest, and any and all other loan documents executed in connection therewith.

**TO HAVE AND TO HOLD** the same unto Assignee, its successors and assigns forever.

This Assignment is made without representations or warranties, of any kind or nature (except as specified above), and without recourse.

**IN WITNESS WHEREOF**, Assignor has caused this Assignment to be executed effective as of this 27th day of July, 2017.

BANK OF AMERICA, N.A. ("Assignor")

By: *Kelly P Rogers*
Name: *Kelly J. Rogers*
Title: *Assistant Vice President*

Witness: *Alisha Rawlinson*
Title: *Officer*

STATE of *Texas*
COUNTY of *Tarrant*

Before me, *Kathryn Newman*, the undersigned, on this, the 27th day of *July*
    (insert name of notary)
2017, personally appeared *Kelly J. Rogers*, ☑ known to me or, ☐ through
production of _____ as identification, who identified her/himself to be
    (insert name of signer)
the *Assistant Vice President* of *Bank of America N.A.*, the person whose name
is subscribed to the foregoing instrument, and being authorized to do so, acknowledged that (s)he had
executed the foregoing instrument as the act of such corporation for the purpose and consideration
described and in the capacity stated.

(seal)

*Kathryn Newman*
(Type or print name below signature)
Notary Public, State of *Texas*
Commission No.: 12978626-7
My Commission Expires: 4-15-2018

VERIFICATION

I, Anthony Medina, am Senior Recoupment Counsel of Chicago Title Insurance Company

and am authorized to make this Verification on its behalf. The statements of fact set forth in the

attached Complaint are true and correct, to the best of my personal knowledge, information and

belief, and I expect to be able to prove the same at a hearing or trial held in this matter. This

Verification is made subject to 18 Pa.C.S.A. §4204 relating to unsworn falsification to authorities.

Dated: 2/14/18